IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DAVID A. C.,[1]           )
                          )
    Plaintiff,         )
                          )
vs.                       ) Case No. 18-cv-1744-DGW[2]
                          )
COMMISSIONER of SOCIAL    )
SECURITY,                 )
                          )
    Defendant.         )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed an application for SSI on July 27, 2015, alleging disability as of May 27, 2015. After holding an evidentiary hearing, the Administrative Law Judge (ALJ) denied the application on December 29, 2017. (Tr. 14-27). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] In keeping with the Court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) and Administrative Order No. 240. See, Docs. 8, 18.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in determining that plaintiff did not meet or equal Listing 1.04.

2. The ALJ did not adhere to SSR 16-3p when he failed properly assess plaintiff's subjective allegations, including his daily activities.

## Applicable Legal Standards

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any step, other than at step 3, precludes a finding of disability. *Ibid.* The plaintiff bears the burden of proof at steps 1–4. *Ibid.* Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in

significant numbers in the national economy. *Ibid.*

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of degenerative disc disease and history of alcohol use.

The ALJ found that plaintiff had the RFC to perform work at the light exertional level, limited to no climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; balancing; occasional stooping, crouching, crawling, and kneeling. Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff did not have any past relevant work, but he was able to do jobs at the light exertional level which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1963 and was 52 years old on the alleged onset date. His reported height was 5'10" and his reported weight was 170 pounds. (Tr. 478). Plaintiff submitted a function report in December 2015 stating that he could not stand for more 2 hours in an 8 hour period and no more than 10 minutes at a time. He also stated that his legs would "go out" if he bent the wrong way and he also had

limited lifting, carrying and reaching ability. He further complained that pain interfered with his ability to concentrate. (Tr. 195). He said that pain caused him to wake up frequently. He noted that he had difficulty stepping into the shower, dressing, and shaving due to his flexibility issues. (Tr. 196). He did acknowledge washing dishes and doing laundry, but he claimed those tasks required a full day to get through because of frequent breaks. (Tr. 196-197). He also stated that his mother drove him to the grocery store once a month, but he rode in a motorized cart. (Tr. 198).

2. **Evidentiary Hearing**

At the evidentiary hearing, plaintiff reported that he was homeless and living in a van outside of his nephew's residence. (Tr. 38, 41). Plaintiff stated that his whole back hurt all the time. (Tr. 45). Plaintiff claimed that he could not work because he could barely stand up for 30 to 40 minutes and he would have to sit down afterwards. Plaintiff stated that this limited his ability to get a job. (Tr. 39, 47). Plaintiff also reported being unable to sit in a chair for more than 10 minutes. (Tr. 47-48). When asked why he had trouble standing up, plaintiff said that he had a bad disc and a spinal fusion. Plaintiff reported that his doctor would not give him pain medication. (Tr. 39).

Plaintiff acknowledged smoking half a pack of cigarettes a day and drinking occasionally, despite having trouble with alcohol. (Tr. 39-40). Plaintiff stated that he used his nephew's residence to cook, bathe, and use the restroom. He also admitted to grocery shopping; doing household chores, including cleaning dishes; doing laundry; and mowing the grass occasionally at his nephew's residence. (Tr.

42-43). He regularly ate free meals at the community center and church. (Tr. 40). Plaintiff rode his bike, walked, or took the bus for transportation. (Tr. 37).

A VE also testified. As there is no issue as to her testimony, it will not be summarized. At the end of the hearing, the ALJ requested a medical expert (ME) to evaluate plaintiff's medical records. (Tr. 55).

### 3. Medical Records

In December 2014, plaintiff visited an emergency room, complaining of left rib pain. He was prescribed Norco and discharged. (Tr. 247). In May 2015, plaintiff saw Dr. Jowe Hsieh, his primary care physician, at McKinley Health Center complaining of sore ribs. (Tr. 314). During his visit with plaintiff, Dr. Hsieh noted that he suffered from alcoholism and had a heavy alcohol intake, along with smoking a pack of cigarettes a day. He also experienced seizures and had chronic obstructive pulmonary disease. Dr. Hsieh scheduled a follow-up appointment and referred plaintiff to a neurologist. (Tr. 314-315).

Plaintiff next sought treatment for rib pain a few days later at an emergency room, complaining that the pain was now radiating into his back. (Tr. 253). Imaging revealed multiple fracture deformities involving T4, T5, T6, T7 and T8 vertebrae, including a T8 burst fracture, and a minimal convex bulge of the inferior margin of the T9 vertebra. (Tr. 258, 297). Degenerative changes were also noted at the anterior aspect of T11 to T12 vertebrae. (Tr. 260). Plaintiff was transferred to St. Louis University Hospital (SLUH) for further treatment. (Tr. 254, 279).

At SLUH, plaintiff was evaluated, and the doctor stated that he had a history

of alcoholism and epilepsy with possible withdrawal seizures. Potentially describing the genesis of plaintiff's pain, the doctor said that plaintiff reported experiencing a seizure at home and later noted persistent back pain. The doctor noted that plaintiff reported mowing his large lawn with a push mower. (Tr. 300).

Plaintiff started going through alcohol withdrawals at SLUH and psychiatric staff was consulted to assist with withdrawal management. (Tr. 286). Plaintiff admitted to drinking heavily daily, giving an approximate consumption of 8 to 12 24 ounce beers daily, and falling frequently. (Tr. 287, 297). After discussing spinal treatment options with Dr. Eric Marvin, plaintiff decided to proceed with a T4 to T10 vertebrae posterior fusion and open reduction internal fixation of his T8 vertebra. The surgery went well, with no complications, and plaintiff was discharged 2 days later. (Tr. 279, 297-298).

On follow-up with neurosurgery at SLUH on June 4, 2015, the plaintiff communicated a significant amount of pain after running out of his pain medications. Plaintiff continued to have full strength and denied numbness, tingling, and radicular pain. His stitches were removed, and he appeared to be healing well. A follow-up with neurosurgery and x-rays were scheduled. (Tr. 366-367).

On June 11, 2015, plaintiff visited the emergency room and was then transferred to SLUH for an injury resulting in acute pain. Plaintiff guessed that he fell down in his kitchen, but did not know for sure. (Tr. 262, 265, 273). Imaging of the lumbar and thoracic spine showed previously placed hardware from his surgery and a newly sustained L1 vertebra burst fracture. (Tr. 417-421, 424). No

acute neurosurgical intervention was indicated; and he was referred for pain control and then discharged in good condition with a back brace. (Tr. 273, 277).

On follow up with neurosurgery at SLUH on June 29, 2015, plaintiff reported only upper back pain. (Tr. 372). Imaging demonstrated good alignment of the previous fusion with no kyphotic deformity, but did reveal a deformity of the superior endplate of the L2 vertebral body. (Tr. 372, 384). Plaintiff was ambulating without difficulty and he was instructed to continue to use his brace until his follow-up visit in 6 weeks (Tr. 372).

Plaintiff saw Dr. Hsieh in July 2015. Plaintiff brought his mother to the appointment. Plaintiff's mother had strong opinions about his prescribed seizure medications and stated that plaintiff had had seizures since childhood. She stated that plaintiff only had seizures occasionally now. Plaintiff disagreed that his seizures were alcohol related. Dilantin was prescribed, and the plaintiff agreed to referral to behavioral health for his alcoholism. (Tr. 318).

In August 2015, plaintiff arrived by emergency medical services (EMS) to the emergency room and stayed overnight after he drunkenly fell off a friend's porch and was found unresponsive. (Tr. 352). Imaging showed degenerative changes with narrowing of the disc spaces as well as central spinal stenosis, but no fractures. (Tr. 341).

On follow-up with neurosurgery on August 10, 2015, plaintiff's doctor assessed him and found that he had full strength in his legs, normal reflexes, normal sensation, and he ambulated independently. His brace was removed and the doctor found that his back wound from the fusion was well-healed. (Tr. 377).

The doctor referred to imaging showing the "coronal plane to be perfectly straight," and the "sagittal plane shows no progressive kyphosis." (Tr. 377). X-rays of the thoracic spine from that time revealed that compression deformities of the T5 to T8 and L2 vertebral bodies were unchanged. (Tr. 385). X-rays of the thoracic spine obtained later in September 2015 showed no active abnormality of the visualized thoracolumbar spine, unchanged posterior spinal fusion instrumentation, and L2 vertebral body compression. (Tr. 386).

In May 2016, plaintiff was admitted to the emergency room when plaintiff's mother witnessed plaintiff have a seizure in her car. Medical notes stated that plaintiff "is alcoholic [sic] and has seizures when trying to cut back on alcohol." (Tr. 475). His prescription bottle of Dilantin, which was filled in February, had 18 pills missing even though was instructed to take the medication 3 times daily. (Tr. 318, 479). On examination, his gait was not impaired, and he walked without an assistive device. (Tr. 475). Imaging of his head yielded negative results. (Tr. 469). In July 2016, plaintiff again visited the emergency room after he was found passed out on the side of the road in Madison, Illinois. (Tr. 494).

In February 2017, plaintiff visited the emergency room for an eye injury he suffered a couple of days before when he tripped on a porch and hit his face on the corner of his patio furniture. Plaintiff's eye was swollen shut, he had an unsteady gait, and he admitted to drinking prior to his arrival. (Tr. 515). Imaging of his head showed evidence of a right inferior orbital wall blowout fracture without CT evidence of ocular muscle entrapment or acute intracranial process. (Tr. 508).

### 4. Medical Expert

The ALJ requested a post-hearing opinion from Dr. Frank L. Barnes. (Tr. 232). Dr. Barnes concluded plaintiff's history of "thoracic and lumbar spine compression fractures with multilevel thoracic spine fusion," and "cervical spine arthritis with central stenosis" would medically equal listing 1.04(A) for one year, May 20, 2015 to May 20, 2016. (Tr. 528-529). In reaching this conclusion, Dr. Barnes reasoned that "most patients do not return to work for a year after this type surgery [sic]." (Tr. 532).

## Analysis

Plaintiff first argues that he met the requirements of Listing 1.04(A) and the ALJ's analysis of whether he met or equaled the listing was inaccurate and insufficient. A finding that a plaintiff's condition meets or equals a listed impairment is a finding that the plaintiff is presumptively disabled. To be found presumptively disabled, the plaintiff must meet all the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that she meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The Listing 1.04(A) describes disorders of the spine and requires a plaintiff to show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and if there is involvement of the lower back, positive straight-leg raising

test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A).[3] Plaintiff argues that the ALJ did not properly consider evidence from the ME, who asserted that he met the Listing for a closed period of 12 months. The ALJ said that plaintiff did not meet this 12 month durational period required for disability and did not meet Listing 1.04 because the record does not demonstrate the requirements of the Listing. The Court agrees with the ALJ and addresses each point in turn.

First, to receive SSI under Title XVI of the SSA, claimant must show he is suffering from a medically determinable physical or mental impairment which can be expected to result in death or, which has lasted or can be expected to last for at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Plaintiff applied for SSI disability on July 27, 2015, which serves as the earliest date that he can claim disability. The ME surmised that plaintiff met the Listing, stating that 1.04(A) is equaled for one year after the fusion surgery ". . . from May 20, 2015 until May 20, 2016." However, plaintiff does not meet the 12 month time frame when taking into consideration his earliest date for the claim, July 27, 2015, and calculating the time frame using the ME's end date on May 20, 2016.

Second, the record does not demonstrate the requirements of the Listing. Listing 1.04(A) requires plaintiff to show "[e]vidence of nerve root compression . . . ." To quote the ME, plaintiff has a history of "thoracic and lumbar spine compression fractures with multilevel thoracic spine fusion," and "cervical spine

---

[3] "Nerve root compression results in a specific neuro-anatomic distribution of symptoms and signs depending upon the nerve root(s) compromised." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(K)(1)

arthritis with central stenosis." No evidence of nerve root compression was found in the record and plaintiff has not alleged that he suffered from that condition. Therefore, even if plaintiff cleared the 12 month disability hurdle, he still does not meet the Listing, regardless of whether the ME thought he did or not.

Plaintiff's other argument fails to turn the tables in his favor. Plaintiff claims that the ALJ equated his minimal activity with capacity to perform substantial gainful activity. The ALJ cited to SSR 16-3p, which supersedes the previous SSR on assessing a claimant's credibility. SSR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." 2016 WL 1119029, at *1. Under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029 at *2. SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529, including a claimant's daily activities. The Seventh Circuit has cautioned against equating the ability to engage in limited daily activities with an ability to work. *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has called improper consideration of daily activities "a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation." *Moore*, 743 F.3d at 1126.

Here, however, the ALJ recounted plaintiff's testimony about his daily activities in manner sufficient to build a logical bridge to his conclusion that plaintiff physically functions to a greater ability than he leads on. Specifically, the ALJ provided plaintiff's testimony in great detail, including his chores and errands. Plaintiff grocery shopped; cooked; cleaned dishes; did his laundry; and mowed a large lawn with a push mower, albeit with conflicting information on frequency, all while struggling greatly with alcoholism. He also appeared to be quite mobile, riding his bike, walking, or riding the bus to take care of errands or eat meals at the community center and church.

Plaintiff suggests that his daily activities are actually "minimal irrelevant activity." (Doc. 13 at 10). This is not the case. The ALJ is required to consider, among other factors, a plaintiff's daily activities in determining whether he is disabled. 20 C.F.R. § 404.1529(a). Furthermore, while it may be error to equate **limited** daily activities with the ability to work full-time, it is not error to consider daily activities; in fact, it is proper for an ALJ to consider a conflict between the plaintiff's claims about what he can do and the evidence as to his activities. See, *Pepper v. Colvin,* 712 F.3d 351, 369 (7th Cir. 2013).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's applications for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   May 21, 2019.**

                                                        **DONALD G. WILKERSON**
                                                       **UNITED STATES MAGISTRATE JUDGE**